The second paragraph in Article VI, of the Constitution of the United States, provides:
 "This Constitution, and the laws of the United States which shall be made in pursuance thereof;
and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." (Emphasis supplied.)
If I were writing on a clean slate, freed from the deference that I do and must give to the opinions of the United States Supreme Court, I could reach the result reached by the majority of this Court in this case, on the preemption issue, for I would adopt the "purpose-effect" and "regulation-interpretation" distinctions suggested as an alternative approach to the "relate to" requirement by William J. Kilberg's and Paul D. Inman's article Preemption of StateLaws Relating to Employee Benefit Plans: An Analysis of ERISASection 514, 62 Tex.L.Rev. 1313, 1328-30 (1984). However, I have given my solemn oath to uphold the Constitution of the United States, and that includes the second paragraph of Article VI; therefore, I must dissent.
Justice O'Connor, in delivering the opinion for a unanimous Court in Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41,44-46, 107 S.Ct. 1549, 1551-52, 95 L.Ed.2d 39 (1987), wrote:
"In ERISA, Congress set out to
 " 'protect . . . participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.' § 2, as set forth in 29 U.S.C. § 1001(b).
 "ERISA comprehensively regulates, among other things, employee welfare benefit plans that, 'through the purchase of insurance or otherwise,' provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability or death. § 3(1), 29 U.S.C. § 1002(1).
 "Congress capped off the massive undertaking of ERISA with three provisions relating to the pre-emptive effect of the federal legislation:
 " 'Except as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .' § 514(a), as set-forth in 29 U.S.C. § 1144(a) (pre-emption clause).
" '. . . .'
". . . .
 " '[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent. " 'The purpose of Congress is the ultimate touchstone.' " ' Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206 (1985), quoting Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978), quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). We have observed in the past that the express pre-emption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.' Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). As we explained in Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983):
 " 'The bill that became ERISA originally contained a limited pre-emption *Page 250 
clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected those provisions in favor of the present language, and indicated that section's pre-emptive scope was as broad as its language. See H.R.Conf.Rep. No. 93-1280, p. 383 (1974); S.Conf.Rep. No. 93-1090, p. 383 (1974).' " (Emphasis supplied.)
In Kilberg and Inman's Preemption of State Laws Relating toEmployee Benefit Plans: An Analysis of ERISA Section 514, 62 Tex.L.Rev. 1313, 1315-16, the following appears:
 "Express preemption provisions such as section 514 must be distinguished from the implied preemption that arises from the supersession inherent in antithetical federal and state commands or from the encroachment of state law into a field occupied by comprehensive federal regulation or interests. To strike down a state law in an implied preemption case, the court must find either a specific conflict between federal and state commands or a clash between zones of sovereign interest. The goal of an implicit preemption analysis should be to accommodate the federal interest with the least possible displacement of state law. The goals of an express preemption analysis, in contrast, should be to prevent subtle or incremental state encroachment into a field that Congress has chosen expressly to reserve for federal law. Yet, courts have mistakenly applied preemption doctrines fashioned in implied preemption cases to section 514 cases, in which the issue is whether the federal law — by its express terms — preempts the state law in question. Once Congress has declared its express intent to preempt or to save a state law, it has largely obviated judicial inquiry into considerations other than those concerning the text of the preemption provision." (Emphasis supplied.)
"[A]ny and all State laws insofar as they may now or hereafter relate to any employee benefit plan," subject to certain exceptions that will be discussed later, is what Congress expressly preempted. 29 U.S.C. § 1144(a). "The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law. . . ."29 U.S.C. § 1144(c). Does this preempt a civil action by Menton, who is a "participant" (29 U.S.C. § 1002(7)) and a "party in interest" (29 U.S.C. § 1002(14)) for an intentional or reckless misrepresentation by HealthAmerica, which is a "party in interest" (29 U.S.C. § 1002(14)) as to the medical coverage benefits provided by a particular employee benefit plan?
Medical coverage benefits are benefits that "accumulate over a period of time and are payable only upon the occurrence of a contingency outside of the control of [Menton];" therefore, they are "risks that ERISA is intended to address,"Massachusetts v. Morash, ___ U.S. ___, 109 S.Ct. 1668, 1669,104 L.Ed.2d 98 (1989). Likewise, the phrase "relate to" has been given its broad commonsense meaning, so that a state law relates to an employee benefit plan "if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines,463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983);Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724,105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); Pilot Life Ins. Co. v.Dedeaux, supra. In this case, the representation was made by a party in interest as to an employee benefit plan to a party in interest as to that same employee benefit plan concerning medical benefits payable under that employee benefit plan. Clearly, the representation related to the employee benefit plan, as "related to" is defined by the United States Supreme Court.
In Pilot Life Ins. Co. v. Dedeaux, supra, Dedeaux's complaint contained three counts: " 'tortious breach of contract' "; " 'breach of fiduciary duties' "; and " 'fraud in theinducement.' " (Emphasis supplied.) 481 U.S. at 43,107 S.Ct. at 1551. At the close of discovery, Pilot Life moved for summary judgment, arguing ERISA preemption. The district court entered summary judgment; the Court of Appeals for the Fifth Circuit reversed; the United States Supreme Court granted certiorari *Page 251 
and reversed the Fifth Circuit and reinstated the summary judgment for Pilot Life. In Belasco v. W.K.P. Wilson Sons,Inc., 833 F.2d 277 (11th Cir. 1987), the Eleventh Circuit Court of Appeals held that Alabama state law claims of bad faith and fraud (which a review of the amended complaint in Belasco shows to be remarkably similar to the fraud alleged in the case at issue) of a plaintiff, who was a "participant" and a "party in interest" as to an employee benefit plan against an insurance company that was a "party in interest" as to that employee benefit plan related to the plan and were pre-empted.
The facts in Davidian v. Southern California Meat CuttersUnion Food Employees Benefit Fund, 859 F.2d 134 (9th Cir. 1988), are similar to the facts in the case at issue. Davidian, a "participant" and "party in interest" as to an employee benefit plan, alleged that he was planning to retire and that the plan gave him a choice of one of three benefits programs. A "party in interest" as to the plan described the third option as paying "approximately 80%" of major medical coverage, like plaintiff's prior coverage, but did not inform the plaintiff that, unlike his prior coverage, reimbursement for major medical expenses under the third option was capped at $20,000.00. The plaintiff enrolled in the third option and subsequently underwent heart surgery. The plan refused to pay plaintiff's medical expenses in excess of $20,000.00. Davidian filed suit against the plan for fraud and deceit. The Ninth Circuit held that Davidian's claims were preempted and addressed Davidian's contention that claims for future benefits, as distinguished from past benefits, are not preempted, as follows:
 "There is no reason for such a distinction based on the purpose of the preemption provisions of the Act. The potential for conflicting and inconsistent state and local regulation of employee benefit plans is as real whether past or future benefits are involved."
859 F.2d at 135.
This Court held that the bad faith refusal to pay insurance benefits under an employee benefit plan by a party in interest as to an employee benefit plan to a party in interest as to that same employee benefit plan did not relate to the plan and was not preempted by ERISA. Hood v. Prudential Ins. Co. ofAmerica, 460 So.2d 1227 (Ala. 1984). After the United States Supreme Court decided Massachusetts Mutual Life Insurance Co.v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), and Pilot Life Ins. Co. v. Dedeaux, supra, we reversed ourselves and held that Hood's bad faith claim was preempted.Hood v. Prudential Ins. Co. of America, 522 So.2d 265 (Ala. 1988). Having had our judicial flexibility rendered rather rigid by our federalist system, we have ruled in favor of ERISA preemption of common law causes of action. See, Landy v.Travelers Insurance Co., 530 So.2d 214 (Ala. 1988); Hood v.Prudential Ins. Co. of America, 522 So.2d 265 (Ala. 1988); andSeafarers' Welfare Plan v. Dixon, 512 So.2d 53 (Ala. 1987).
Justice O'Connor in Pilot Life, supra, wrote:
 "The Solicitor General, for the United States as amicus curiae, argues that Congress clearly expressed an intent that the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits, and that varying state causes of action for claims within the scope of § 502(a) would pose an obstacle to the purposes and objectives of Congress. Brief for United States as Amicus Curiae 18-19. We agree. The conclusion that § 502(a) was intended to be exclusive is supported, first, by the language and structure of the civil enforcement provisions, and second, by legislative history in which Congress declared that the pre-emptive force of § 502(a) was modeled on the exclusive remedy provided by § 301 of the Labor-Management Relations Act (LMRA), 61 Stat. 156, 29 U.S.C. § 185.
 "The civil enforcement scheme of § 502(a) is one of the essential tools for accomplishing the stated purposes of ERISA. The civil enforcement scheme is sandwiched between two other ERISA *Page 252 
provisions relevant to enforcement of ERISA and to the processing of a claim for benefits under an employee benefit plan. Section 501, 29 U.S.C. § 1131, authorizes criminal penalties for violations of the reporting and disclosure provisions of ERISA. Section 503, 29 U.S.C. § 1133, requires every employee benefit plan to comply with Department of Labor regulations on giving notice to any participant or beneficiary whose claim for benefits has been denied, and affording a reasonable opportunity for review of the decision denying the claim."
481 U.S. at 52-53, 107 S.Ct. at 1555-1556. (Emphasis supplied.)
In view of this policy, I cannot see how civil actions for bad faith in processing claims for benefits under ERISA plans are preempted and civil actions for misrepresentations made by a "party in interest" to a "party in interest/participant" concerning the coverage under ERISA plans are not, and, indeed, they have been so preempted in most cases since Pilot Life, supra. See, i.e., Pilot Life (fraud in the inducement); Belasco
(misrepresentation of benefits payable under an ERISA plan);Davidian (misrepresentation of benefits payable under an ERISA plan). I have studied all of the cases cited in the majority opinion, in briefs, and at oral argument by the parties, and I do not believe that an analysis of each case would be helpful to the bench or bar. Contrary to what the majority contends, I believe that the weight of authority of cases decided sincePilot Life, supra, supports my conclusion.
Reluctantly, I would hold Menton's claim to be related to the Press Register's employee benefit plan and preempted by ERISA on authority of Shaw v. Delta Air Lines, supra; MetropolitanLife Ins. Co. v. Massachusetts, supra; Pilot Life Ins. Co. v.Dedeaux, supra; Belasco v. W.K.P. Wilson Sons, Inc., supra; and Davidian v. Southern California Meat Cutters Union FoodEmployees Benefit Fund, supra.
I am not persuaded that civil actions for bad faith or fraud have anything to do with regulation of employee benefit plans or that the purpose for such actions is to affect the terms and conditions of employee benefit plans. However, I believe that this has been decided otherwise by a higher court; and I cannot justify holding that Menton's cause of action does not "relate to" an employee benefit plan in order to save it from pre-emption, when the causes of action asserted in Pilot Life, supra, for tortious breach of contract and fraud in the inducement and the causes of action asserted in Belasco, supra, for bad faith and fraud were held to "relate to" employee benefit plans and therefore to be preempted. To so hold would be to make a distinction without a difference.
Is Menton's cause of action exempted from preemption under29 U.S.C. § 1144(b)(2)(A)? That statute reads:
 "[N]othing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance. . . ."
The trial court indicated that it was not granting HealthAmerica's and Merle's motions for directed verdict, because the HMO statutes and the Alabama "twisting" statute were laws regulating insurance and, under the evidence, could be the basis of Menton's cause of action. Prior to final judgment, Menton's complaint did not mention or purport to be brought under either statute.
The HMO statutes did not become effective until May 29, 1986, almost a year after Menton's cause of action accrued. As a general rule, statutes, except remedial statutes, will not be construed to have retroactive effect unless the language of the statute expressly indicates that the Legislature so intended.Jones v. Casey, 445 So.2d 873 (Ala. 1983). There is no expression of legislative intent that the HMO statutes apply to causes of action that accrued prior to the effective date of that legislation. This Court defined remedial statutes inStreet v. City of Anniston, 381 So.2d 26, 29 (Ala. 1980), as "those relating to remedies or modes of procedure, which do not create new rights or take away vested ones." For Menton's cause of action to be saved from preemption by the HMO statutes, the statutes *Page 253 
would have to regulate insurance and give him a new private cause of action. A statute creating a new right, a new cause of action, is clearly substantive in nature and would not be given retroactive application in the absence of a provision indicating a contrary legislative intent. I need not address whether the HMO statutes create a private cause of action, for if they do they will not be given retroactive effect. Therefore, I need not discuss whether the Alabama HMO statutes "regulate insurance," for Menton's cause of action for misrepresentation is not saved from preemption by the HMO statutes.
The purpose for Chapter 12 ("Trade Practices Law") of Title 27 ("Insurance") is expressed in § 27-12-1(a):
 "The purpose of this chapter is to regulate trade practices in the business of insurance in accordance with the intent of congress as expressed in the Insurance Regulation Act by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined."
Section 27-12-6 ("Twisting") provides:
 "No person shall make or issue, or cause to be made or issued, any written or oral statement misrepresenting or making misleading incomplete comparisons as to the terms, conditions or benefits contained in any policy for the purpose of inducing, or attempting or tending to induce, the policyholder to lapse, forfeit, surrender, retain, exchange or convert any insurance policy." (Emphasis supplied).
Section 27-1-2(3) defines "person" for the purposes of Title 27 as follows:
 "An individual, insurer, company, association, organization, Lloyd's insurer, society, reciprocal insurer or interinsurance exchange, partnership, syndicate, business trust, corporation and every legal entity."
Section 27-1-2(2) defines "insurer" for the purposes of Title 27 as follows:
 "Every person engaged as indemnitor, surety or contractor in the business of entering into contracts of insurance."
In Pilot Life, supra, Dedeaux did not contend that his cause of action for fraud in the inducement was a law that regulated insurance and was thus saved from preemption, so this was not discussed by Justice O'Connor in her opinion. Dedeaux did contend that the cause of action for bad faith did regulate insurance and was saved from preemption by § 514(b)(2)(A). In regard to this, Justice O'Connor wrote that the Court first took "what guidance was available from a 'common-sense view' of the language of the saving clause itself." 481 U.S. at 48,107 S.Ct. 1553 ("any law of any State which regulates insurance"). "Second," she wrote, "we made use of the case law interpreting the phrase 'business of insurance' under the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., in interpreting the saving clause"; and, she noted that in doing so the Court used these criteria:
 " '[F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.' "
481 U.S. at 48-49, 107 S.Ct. at 1553-54 (quoting Union LaborLife Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002,3008, 73 L.Ed.2d 647 (1982) (emphasis in original).
In applying the "common sense view," Justice O'Connor reasoned that the phrase "regulates insurance" does not support the argument that the Mississippi law of bad faith falls under the saving clause, since the Mississippi Supreme Court, as early as 1915, had recognized that punitive damages were available in a contract case when " 'the act or omission constituting the breach of [any contract, not just an insurance] contract amounts also to the commission of a tort.' "
 "Certainly a common-sense understanding of the phrase 'regulates insurance' *Page 254 
does not support the argument that the Mississippi law of bad faith falls under the saving clause. A common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but be specifically directed toward that industry. Even though the Mississippi Supreme Court has identified its law of bad faith with the insurance industry, the roots of this law are firmly planted in the general principles of Mississippi tort and contract law."
481 U.S. at 50, 107 S.Ct. at 1554.
The Alabama "twisting" statute appears to be directed toward the insurance industry. However, since 1907, the Alabama Legislature has provided a civil action for "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge." § 6-5-101. The Alabama Supreme Court, at least since 1933, has allowed punitive damages to be recovered in such misrepresentation actions, when the misrepresentations were made by the defendant with the intent to defraud the plaintiff. Cartwright v. Hughes,226 Ala. 464, 147 So. 399 (1933). So the roots of misrepresentation were firmly planted in the general principles of Alabama tort law, before the Legislature enacted the "twisting" statute in 1971. Until the post-final judgment amendment of his complaint, Menton had pursued his civil action against HealthAmerica and Merle under this firmly planted general principle of Alabama tort law.
In Pilot Life, supra, the United States Supreme Court found that the factors set out in the McCarran-Ferguson Act did not support Dedeaux's assertion that the Mississippi law of bad faith "regulates insurance," for (1) it did not affect a spreading of policyholder risk; (2) "[t]he state common law of bad faith is . . . no more 'integral' to the insurer-insured relationship than any State's general contract law is integral to a contract made in that State." 481 U.S. at 51,107 S.Ct. at 1555; and (3) "Mississippi's law of bad faith, even if associated with the insurance industry, has developed from general principles of tort and contract law available in any Mississippi breach of contract case." 481 U.S. at 51,107 S.Ct. at 1555. The Court then held "the Mississippi common law of bad faith at most meets one of the three criteria used to identify the 'business of insurance' under the McCarran-Ferguson Act, and used in Metropolitan Life to identify laws that 'regulat[e] insurance' under the saving clause."
I do not find that the "twisting" statute affected a spreading of the risks among policyholders; or that the "twisting" statute is more integral to the insurer-insured relationship than Alabama's misrepresentation statute, as developed from general principles of tort law; or that the statute in its definition of "person" and "insurer" is limited to entities in the insurance business.[2] Therefore, using Justice O'Connor's criteria for determining when a state law "regulates insurance" and is therefore saved from ERISA preemption, I would find that the "twisting" statute does not save Menton's claim from preemption. By this, I do not mean to imply that Alabama's "twisting" statute affords a private cause of action to Menton.[3] I need not reach this issue. *Page 255 
A unanimous United States Supreme Court in Pilot Life, supra, held that Dedeaux's state law claims, including bad faith and fraud in the inducement, were preempted, even though Dedeaux elected not to assert any of the remedies that would be available under ERISA. Menton elected not to assert any of the remedies that would be available to him under ERISA, i.e., to clarify and enforce his rights under the terms of the plan as represented to him, and to obtain equitable relief (reformation of the health insurance contract to remove the time limitation on physical therapy and orthopedic appliances benefits), etc.29 U.S.C. § 1132(a). These benefits and an award of attorney fees could have been available to Menton under ERISA, whether he sued in federal or in state court, if he had prevailed on his ERISA claim. Pilot Life, 481 U.S. at 53, 107 S.Ct. at 1556. Therefore, ERISA did not deny Menton a remedy. At the conclusion of Pilot Life, 481 U.S. at 57, 107 S.Ct. at 1558, Justice O'Connor wrote:
 "Metropolitan Life [Ins. Co. v. Massachusetts, supra], did not involve a state law that conflicted with a substantive provision of ERISA. Therefore the Court's general observation — that state laws related to ERISA may also fall under the saving clause — was not focused on any particular relationship or conflict between a substantive provision of ERISA and a state law. In particular, the Court had no occasion to consider in Metropolitan Life the question raised in the present case: whether Congress might clearly express, through the structure and legislative history of a particular substantive provision of ERISA, an intention that the federal remedy provided by that provision displace state causes of action. . . .
 "Considering the common-sense understanding of the saving clause, the McCarran-Ferguson Act factors defining the business of insurance, and, most importantly, the clear expression of congressional intent that ERISA's civil enforcement scheme be exclusive, we conclude that Dedeaux's state law suit asserting improper processing of a claim for benefits under an ERISA-regulated plan is not saved by § 514(b)(2)(A), and therefore is pre-empted by § 514(a)."
This action was filed while Hood v. Prudential Ins. Co. ofAmerica, supra (Hood I), was the law. Prior to final judgment in this case, the United States Supreme Court decided PilotLife, supra, and we decided Seafarers' Welfare Plan v. Dixon, supra. However, it was after final judgment in this case that this Court reversed Hood v. Prudential Ins. Co. of America, supra (Hood II) and decided Landy v. Travelers InsuranceCo., supra. Therefore, I would reverse the judgment of the trial court; however, rather than rendering judgment or remanding with instructions that the trial court grant HealthAmerica and Merle's motion for JNOV, I would reverse and remand and afford Menton the opportunity to amend to state a claim under ERISA.
At the time this complaint was filed, Menton had every reason to believe, every reason to predict, that his state law cause of action asserting misrepresentation of coverage afforded by a health insurance plan would not be preempted by ERISA. SeeHood I. During the course of this litigation in the circuit court and during this appeal, the rules were changed. This Court could not and did not predict this. See Hood I.
I, as a member of the Supreme Court of Alabama, will not thwart an opportunity for a remedy for one whose right to a particular remedy was foreclosed only by his astute attorneys' not being able to guess how Justices would rule. It seems appropriate and altogether just to invoke equitable relief, which is afforded by 29 U.S.C. § 1132(a)(3), to one whose civil cause of action was foreclosed by an expansion of the ERISA preemption after that cause of action had accrued and after an action to enforce it had been filed. See, Culberson v. BankersLife Co., 541 So.2d 480 (Ala. 1989).
I would reverse and remand to permit Menton to amend and proceed with a cause *Page 256 
of action under ERISA, 29 U.S.C. § 1132(a). Therefore, I dissent.
MADDOX, J., concurs.
[2] Alabama Code 1975, § 27-12-24, provides:
 "No insurer shall, without just cause, refuse to pay or settle claims arising under coverages provided by its policies in this state. . . ." (Emphasis supplied.)
 From the pleadings in Belasco v. W.K.P. Wilson Son, Inc., supra, we cannot determine whether this Code section, which is contained in Chapter 12 ("Trade Practices Law") of Title 27 ("Insurance") was relied on by Belasco as a law regulating insurance.
 "Plaintiffs argue that the Alabama law of bad faith, which forms the basis of one of their claims, is a 'law . . . which regulates insurance,' 29 U.S.C. § 1144(b)(2)(A), and therefore falls under the saving clause. However, the Alabama law of bad faith appears to us to have the same roots 'in the general principles of . . . tort and contract law' as was the case in Dedeaux."
833 F.2d at 281.
[3] In Farlow v. Union Cent. Life Ins. Co., 874 F.2d 791 (11th Cir. 1989), the Eleventh Circuit Court of Appeals held that the Alabama twisting statute does not create a private cause of action.